**In re the CIRCLE K CORPORATION; Circle K Convenience Stores, Inc.; Circle K Management Company; Lar–Lin, Inc.; First Circle Properties, Inc.; Utotem, Inc.; Utotem Markets of Arizona, Inc.; U Totem of Alabama, Inc.; U–Tote'm of Colorado Inc.; U–Tote'm of Miami, Inc.; Tic Toc Systems, Inc.; Monterre Properties, Inc.; Shop & Go, Inc.; Circle K General, Inc.; Circle K Hawaii, Inc.; Combined Aviation Co.; Charter Marketing Company (Connecticut); Charter Marketing Company;**

**Mr. B's Oil Co., Inc.; Mr. B's Food Mart, Inc.; NPI Corporation; Old Colony Petroleum Company, Inc.; New England Petroleum Distributors, Inc.; and 44th Street & Camelback Limited Partnership, Debtors.**

**Bankruptcy Nos. B–90–5052–PHX–GBN to B–90–5075–PHX–GBN.**

United States Bankruptcy Court, D. Arizona.

June 11, 1992.

Tad R. Smith, Kemp, Smith, Duncan & Hammond, El Paso, Tex., for debtors.

Carl T. Anderson, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for Sr. Secured Noteholders.

Deborah M. Buell, Cleary, Gottlieb, Steen & Hamilton, New York City, for Official Unsecured Creditors' Committee.

Dawn Stoll Zeitlin, Dushoff, McCall & Zeitlin, Phoenix, Ariz., R. Paul Wickes, Shearman & Sterling, New York City, for Citibank, N.A.

Martin F. Brecker, Anderson Kill Olick & Oshinsky, P.C., New York City, for Official Committee of Debenture Holders.

Thomas H. Allen, Phoenix, Ariz., Office of the U.S. Trustee.

## MEMORANDUM OF DECISION

GEORGE B. NIELSEN, Jr., Bankruptcy Judge.

On June 25, 1991, Citibank, N.A., filed its application for reimbursement of fees and expenses through May 31, 1991. Docket No. 4537. Specifically, Citibank, as an agent for a bank group, sought reimbursement for $1,651,377.20 in fees, and costs of $280,138.69, to the law firm of Shearman & Sterling ("Shearman"). Citibank also sought a professional fee of $56,422.00, and reimbursement of costs of $23,535.01, for the law firm of Gust, Rosenfeld & Henderson ("Gust"). Objections were filed by debtors, Docket No. 4836, the official committees, Docket No. 4704, and the senior secured noteholders, Docket No. 4738.

### I

Debtors' various entities filed Chapter 11 business reorganization petitions within this District on May 15, 1990. As of the filing date, debtors owed $260 million, plus accrued interest, fees and expenses to various Citibank entities and Citibank, as agent for the bank group, under a $325 million creditor agreement dated April 5, 1989, as amended (bank credit agreement or "BCA".)

Also as of filing, Circle K Convenience Stores, Inc. and Circle K General, Inc. ("In-

D.J. Baker, Weil, Gotshal & Manges, Houston, Tex., John J. Dawson, Streich Lang, Phoenix, Ariz., Harvey R. Miller, Weil, Gotshal & Manges, New York City,

terim Borrowers") were indebted for $52 million, plus interest, fees and expenses to various financial institutions ("Interim Banks"), the American Financial Corporation ("AFC") and Citibank, as agent, under a $60 million credit agreement, guarantee and standstill contract dated December 22, 1989, as amended (Interim Creditor Agreement or "ICA").

In an amended cash collateral stipulation of April 1, 1991 ("the amended stipulation"), debtors agreed the value of prepetition collateral and proceeds was, as of the filing date, greater than the outstanding interim debt. Debtors stipulated the secured lenders were entitled to interest, fees and expenses accruing post-petition on the interim debt. 11 U.S.C. § 506(b). In paragraph 2(a) of the amended stipulation, debtors agreed to pay, as adequate protection, accrued ICA interest at the nondefault rate on the last business day of each month, as well as approved fees and expenses.

Section 12.04 of the ICA provided debtors would pay all loan costs and expenses, including reasonable fees, out-of-pocket expenses and travel of bank group counsel.

Pre–Petition debtors paid all invoices for fees and expenses of Shearman arising from legal services provided to the agent in the negotiation, enforcement and administration of the ICA. Such invoices covered fees and expenses prior to this application.

Shearman and Gust recorded a total of 8019.6 hours and 374.1 hours, respectively, including time spent preparing fee applications. Objectors have stipulated to the above hours and fees.

Under the ICA, bank group members are billed ratably for fees and expenses of both firms, pending Court approval of fees. Any amounts recovered by the agent through this application will be distributed among the ICA group.

The BCA group is also billed ratably for fees and expenses of the firms. Rates charged are the usual rates for bankruptcy matters. Neither firm made adjustments due to the complexity of the cases. Counsel recorded time to 11 different project categories beginning in July, 1991.

## II

■ Following a hearing, oral argument and extensive briefing, this matter was submitted. Objectors correctly allege applicant has the burden of establishing reasonableness of fees. They argue the agent did not meet this burden. They suggest the allocation formula is arbitrary and inconsistent with the agent's allocation of fees to the bank group, except as to AFC.

Objectors note a 50/50 allocation formula was adopted by the agent in June, 1990. Under that formula, the agent would charge fees of counsel to the BCA and the ICA, on a 50/50 basis where the fees incurred benefited both credit facilities. Bank group counsel testified, in certain matters, it was difficult to allocate rationally time to one or another account. On occasion, billings would have to be arbitrarily divided. Debtors suspect the agent uses this method to cause most legal expenses to be paid by debtors, although much bank group debt is undersecured.

It is suggested the estate should pay legal fees based on the respective portions of debt that are undersecured or oversecured. Such an approach is reasonable, debtors urge, since as the over-secured facility is reduced by payments, legal expenses of the over-secured portion are reduced. By contrast, under the 50/50 approach, if $1.00 is owed on the ICA, the agent will charge each facility for half the attorney time.

Objectors further complain that certain projects are charged solely to the ICA, including cash collateral, reclamation, post-petition financing and collateral issues. Objectors believe these projects also benefited the BCA. Thus, when comparing charges, ICA allocations are not reasonable. While the BCA is five times larger, objectors believe 60% of all legal expenses are charged to the ICA. This is alleged to be excessive and disproportionate. Objectors also dispute that the estate should pay for a proposed, but unexecuted post-petition loan.

Finally, debtors state the application is interim and they reserve a right to object

to any final award. Objectors suggest, since this is an interim fee, the Court should be conservative, noting other professionals are subject to a 20% fee holdback.

### III

The agent argues the approved stipulation mandates that debtors pay reasonable fees and expenses. The only issue is whether legal costs are necessary and reasonable. The agent notes this is not an interim § 331 application. Counsel have already been paid by the bank group.

Attorney Shearman testified he faced the allocation issue while preparing his first statement for post-petition fees. After discussions with Citibank and colleagues, he decided the firm would keep time by projects. If services related to one facility, it was so billed. If related to the other facility, it was billed to that account. If the matter was of a general nature, it would be split evenly between the two credit agreements.

Mr. Shearman identified the accounts to which services are charged. These included pre-petition projects, on which an even split would occur, and post-petition projects. Expenses related to proposed post-petition financing are assigned to the ICA, since payments received would reduce that debt. Reclamation matters received an equal split between the facilities. Services concerning administration or enforcement of ICA collateral were charged solely to ICA. Two examples included the Kathary sale/leaseback transaction and sale of debtors' Hawaii stores. The BCA facility is charged for services in connection with the subsidiary stock collateral. Counsel also provided services concerning possible financing from trade creditors. This would have resulted in those creditors receiving liens on ICA collateral. Counsel integrated provisions for payment of reclamation claims from proceeds of ICA collateral into the amended stipulation. All such services are charged to the ICA. Counsel prepared model proofs of claim and negotiated a stipulation that avoided creditors having to attach voluminous supporting documents to claims. Such services were split evenly between the facilities, as were legal expenses related to a possible plan of reorganization.

Counsel reviewed documents and attended hearings and meetings. Time was allocated according to the nature of the activity. For example, time spent at hearings on the amended stipulation was charged to the ICA. Time spent on general matters is divided equally.

Internally, the bank group agreed to allocate legal costs by each bank's pro rata share of the group's total exposure. Counsel sent each group member a monthly statement. The agent suggests fees and expenses were reasonable; it used a rational, conservative approach to allocation. Where a court-approved stipulation provides for adequate protection through payment of attorneys' fees and expenses, the only issue is reasonableness. Certain services related primarily to the ICA. These include the amended stipulation, which expressly defers a dispute on whether the security for the ICA is avoidable. By its terms, the amended stipulation "passes on the bank credit agreement." Thus, the amended stipulation provides adequate protection only to ICA interests.

Concerning possible creditor financing, the trade creditors sought liens on property constituting ICA collateral. Any post-petition financing would be conditioned on applying proceeds to pay off the ICA.

As to enforcement of the bank group rights in ICA collateral, Citibank notes, under the amended stipulation, proceeds from sale of ICA collateral is applied to pay the ICA. Citibank disputes that as the ICA is paid down, it benefits the BCA by affording access to ICA collateral.

The agent believes objectors' position is ironic since debtors disputed the bank group's right to apply ICA collateral in satisfaction of the BCA. The parties agreed to defer that dispute. If all ICA debt is repaid, any access by BCA lenders to ICA collateral will have to be negotiated. Thus, reduction of ICA debt does not provide BCA creditors access to ICA collateral.

The agent believes its 50/50 allocation is reasonable, although it concedes equal allocation in some areas would be arbitrary. Objectors' proposed allocation is considered artificial. Although the amount owed under the ICA is less than the BCA facility, the complex ICA collateral package requires a major commitment of counsels' time. The 16/84 proposed allocation fails to recognize that legal services at the same cost may be required regardless of claim size. For example, preparing proofs of claim was equally complex, notwithstanding unequal value. In addition, the ICA is a $52 million debt. This is of sufficient size to warrant substantial efforts. As a result, legal services are required, even if bank group exposure is limited.

The agent believes the bank group allocation has no bearing on whether the allocation between ICA and BCA is reasonable. The reason a pro rata approach is utilized among the bank group is administrative.

## IV

The debenture holders' committee maintains even if fees are reasonable, an award would be premature. The committee feels the amended stipulation merely provides that additional fees will be added to the bank group claim at confirmation.

The committee previously filed for disallowance of the bank group claim under 11 U.S.C. § 502(d). Although the bank group argued the amended stipulation only required disgorgement under § 510, not § 502(d), such position is alleged contrary to § 506(b) and renders that section meaningless.

The committee argues only an allowed secured claim is entitled to interest and fees. The bank group does not have such a claim because of the committee challenge. Thus, it is not entitled to fees.

## V

Although § 506(b) does not use the specific language of "attorneys' fees," legislative history makes it clear attorneys' fees and costs agreed to by contracting parties are allowed to an over-secured claimant. *Meritor Mortgage Corp., West v. Salazar*

*(In re Salazar)*, 82 B.R. 538, 540 (9th Cir. BAP 1987).

When fees are provided in the underlying agreement and the creditor is oversecured, allowance of attorneys' fees is mandatory. *Pasatiempo Properties v. Le Marquis Associates (In re Le Marquis Associates)*, 81 B.R. 576, 578 (9th Cir. BAP 1987); *Dalessio v. Pauchon (In re Dalessio)*, 74 B.R. 721, 723 (9th Cir. BAP 1987). It is well recognized that in reviewing a fee request, the Bankruptcy Court exercises discretion, considering factors such as whether the fees and costs were reasonably calculated to protect the creditor. *In re Salazar, supra*, 82 B.R. at 540, n. 2. In short, the mandatory award under § 506(b), is tempered by reasonableness. *In re Le Marquis Associates, supra*, 81 B.R. at 578.

In defining reasonableness, the key is whether the creditor incurred expenses that fall within the scope of the agreement and took action that similar creditors would take. A Bankruptcy Court should inquire whether, considering all relevant factors, the creditor reasonably believed the services were necessary to protect its interests. *In re Le Marquis Associates*, 81 B.R. at 578.

A reasonableness requirement is to prevent overreaching or collusive fee arrangements. *In re Dalessio*, 74 B.R. at 723. A court should not reward a creditor whose aggressive attorney harasses and opposes debtor at every stage. Nor should an oversecured creditor have a blank check to incur fees and costs that will automatically be reimbursed. In determining reasonableness under § 506(b), the Court looks not to state law, but makes an independent evaluation. *Joseph F. Sanson Investment Co. v. 268 Limited (Matter of 268 Limited)*, 789 F.2d 674, 677 (9th Cir. 1986). There is nothing in the section that requires immediate payment. *Florida Partners Corp. v. Southeast Co. (In re Southeast Co.)*, 868 F.2d 335, 340 (9th Cir. 1989).

The debenture holders' committee argues that even if reasonable, no fees should be paid, since the bank claim is not deemed

allowed. The committee suggests payment, if any, should await plan confirmation.

A claim is allowed under § 502(a) unless a party objects. In the instant case, the official committees filed an objection to the bank group claim under § 502(d). The Court, while not overruling the objection, has abated the matter to enable debtors to conduct an investigation to determine whether an adversary should be filed. At the present time, the claims are still allowed.

In the amended stipulation, debtors stipulated the bank group's ICA claim is oversecured. Under stipulation section 2, the parties agreed debtors shall pay interest at a nondefault rate, monthly, with Court-approved fees and expenses.

In short, there is authority for authorization of payment of reasonable fees and costs incurred by the bank group. The only remaining issue is whether the amounts sought are reasonable.

## VI

The briefs of objectors at the outset were silent on whether the amounts sought were unreasonable. The papers contained little discussion whether any specific charges were inappropriate. Objectors did suggest fees should not be awarded for work on post-petition financing. Assuming the agent is correct that debtors requested this financing package be drafted, and subsequently canceled the transaction, it is unfair to disallow fees. This is especially true if other professionals received fees for time spent on the same issue.

Objectors' briefs did not establish bank counsel harassed debtors at every turn. Instead, objectors alleged the agent did not prove the reasonableness of the allocation formula. Objectors argue the agent failed to establish that services exclusively charged to the ICA were reasonable, when significant work also benefited the BCA. Objectors are also concerned that bank group counsel are subject to guidelines binding other professionals for compensation awards. This would include complete time descriptions without clumping tasks in a single entry.

In short, other than a requirement that agent's counsel follow the same guidelines as estate professionals, objectors' primary concern was with the allocation formula.

■ The argument is whether the agent reasonably allocated fees billed by the bank professionals between the BCA and ICA. The ICA, by stipulation, is oversecured. Thus the ICA bank group is entitled to § 506(b) fees.

The agent utilized a 50/50 formula. As Mr. Sherman testified:

> We would keep our time in our diary entries by more or less projects. And ... if the project related to one account it would be billed to that ... credit agreement, if it related to the other credit agreement the time would be billed to that one, and if it was a general application the time would be split evenly between the two credit agreements.

Transcript, p. 62, Docket No. 6158.

Objectors state this is not fair as the oversecured ICA accounts for 16% of overall bank group debt, while the undersecured BCA accounts for 84%. As a result, a 50/50 allocation unfairly requires the estate to pay a portion of the fees for the undersecured BCA.

Any allocation formula adopted will carry a degree of arbitrariness. The Court could adopt a pro rata formula which allocates fees based on the relative size of each facility or accept the agent's formula, which examines each billing entry, and, if related to one facility, would bill that facility. If the entry involved a general application, an equal allocation occurred.

The Court will change the bank group's allocation formula. Where a billing event relates to one facility, counsel will charge that facility. Where the entry is of general application, this Court will require allocation on a pro rata basis. This approach has two advantages: It charges time primarily related to one facility to that debt, rather than the other. If the work is primarily tied to the ICA or the BCA, the billing should so reflect. The agent should not be required to allocate away 80% of a billing entry because the BCA is tangentially benefited.

Second, where the work benefits both facilities, the service should be divided on a pro rata basis reflecting the percentage of debt represented by each facility. The equal allocation formula fails to consider the exposure of each debt facility. It unfairly places the burden on the estate for payment of fees that primarily benefit the BCA, since the BCA represents the majority of debt.

## VII

Objectors note certain significant projects, such as reclamation claims, cash collateral issues and post-petition financing, are charged only to the ICA. They argue these projects also benefited the BCA.

In its first post-trial memorandum, Citibank states it charged equally between ICA and BCA facilities on reclamation. It further states the agent charged solely to the ICA on enforcement of ICA collateral, the amended cash collateral stipulation and post-petition financing.

Activities that resulted in a paydown of the ICA are properly chargeable to the ICA, such as post-petition financing and enforcement of ICA's security interests. Reclamation matters already allocated between both facilities, are properly divided, subject to the above modification. As to the amended cash collateral stipulation, the agent did allocate pre-petition activities to both facilities. This included negotiating the initial cash collateral stipulation. Objectors did not clearly articulate why the amended stipulation should be allocated between both. The agent provides valid reasons for allocating the time to the ICA. Accordingly, the agent's allocation is found to be proper.

## VIII

This Court will authorize immediate payment of the fee award. There is no suggestion such payment would be a hardship for debtors. It the bank group claims are subordinated, the parties can later address disgorgement.

As to compliance with United States Trustee guidelines, there is no reason bank professionals should not be bound by guidelines previously approved. An exception would be a hold-back requirement, since bank group professionals are not seeking interim compensation under § 331. The agent here seeks fees and costs under § 506(b).

The Court will approve a stipulated implementing order, if the parties are able to negotiate such a document. If not, the Court will set a status hearing based upon the request of a party.

ORDERED ACCORDINGLY.